UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| EXECUTIVE MANAGEMENT SERVICES, INC., et. al., | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) CAUSE NO. 1:13-cv-582-WTL-MJD ) |
| FIFTH THIRD BANK, | ) ) |
| Defendant. | ) |

## ENTRY ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

This cause is before the Court on Defendant Fifth Third Bank's ("Fifth Third") motion for judgment on the pleadings (dkt. no. 37). The motion is fully briefed, and the Court, being duly advised, **GRANTS IN PART AND DENIES IN PART** the motion for the reasons, and to the extent, set forth below.

### I. STANDARD

In reviewing a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), the Court applies the same standard that is applied when reviewing a motion to dismiss pursuant to Rule 12(b)(6). *Pisciotta v. Old Nat'l Bancorp.*, 499 F.3d 629, 633 (7th Cir. 2007). The Court "take[s] the facts alleged in the complaint as true, drawing all reasonable inferences in favor of the plaintiff." *Id*. The complaint must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While there is no need for detailed factual allegations, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" and "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Pisciotta*, 499 F.3d at 633 (citation omitted).

## II.   BACKGROUND

The Plaintiffs, Executive Management Services, Inc., EMS Florida, Inc., D&B Ventures, LLC, and Air Golf II, LLC's (collectively "EMS") suit against Fifth Third arises out of an agreement whereby Fifth Third and EMS agreed to an interest rate swap.[1]  The facts that follow are those taken in the light most favorable to EMS.

EMS is "a commercial cleaning, facility maintenance and management company headquartered in Indianapolis, Indiana." Complaint ¶ 13.  In 2004, Fifth Third assisted EMS with procuring corporate bonds from The Bank of New York Mellon ("BNYM") to finance expansions of EMS's operations and refinance portions of its existing debt.  On September 1, 2004, EMS and BNYM entered into a Trust Indenture that authorized BNYM to issue up to ten million dollars to EMS in corporate bonds.  Fifth Third issued a letter of credit to BNYM as collateral for the corporate bonds.

Unfortunately, the interest rate on the corporate bonds was variable and thus unsuitable for EMS.  Fifth Third, therefore, approached EMS and recommended an interest rate swap agreement whereby EMS's variable rates would be effectively "swapped" for fixed rates.  The swap agreement was to be a mechanism whereby EMS could hedge against interest rate volatility on its corporate debt.  Relying on Fifth Third's advice, in January 2006, the parties entered into an International Swaps and Derivatives Association ("ISDA") agreement.

---

[1] An interest rate swap is a mechanism for converting a borrower's variable interest rate to a commercially reasonable effective fixed rate.  The parties entering into the agreement select a hypothetical monetary amount, known as the "notational amount," which is simply used to calculate the parties' obligations to each other.   One party then agrees to pay the other a fixed rate of interest on the notational amount and the other party agrees to pay a floating interest rate derived from an index such as the London Interbank Offered Rate ("LIBOR").  In this case, Fifth Third agreed to pay to EMS a variable LIBOR-based rate and EMS agreed to pay a fixed rate of interest on the notational amount.  Therefore, if the LIBOR rate was greater than the fixed rate, Fifth Third would pay EMS; if the fixed rate was greater, EMS would pay Fifth Third.

The parties entered into several swap transactions in varying amounts from January 2006 through April 2008. For all of these transactions, the LIBOR-based rate closely tracked the fixed rate such that any disparities were de minimus. However, this changed in 2008 when the credit crisis occurred. The LIBOR plummeted, at times as low as .19% and .25%, causing EMS to pay much more than they expected to pay under the swap agreement. As a result, EMS paid both the high variable rate on its corporate debt and the fixed rate pursuant to the swap agreement, while receiving only the minimal LIBOR-based rate back from Fifth Third.

EMS began an investigation into the swap agreement, and requested certain information from Fifth Third; however, Fifth Third provided incomplete information and refused to meet with EMS. In February 2011, Fifth Third unilaterally terminated the banking relationship, including the swap agreement, and charged EMS $577,905 in early termination fees. EMS was therefore forced to change banks and had to pay the fees in order to secure Fifth Third's release of its collateral. EMS filed this suit in April 2013.

### III. DISCUSSION

EMS's Complaint brings four counts against Fifth Third: (1) a claim for frustration of commercial purpose; (2) a claim for recession or reformation due to mutual mistake; (3) a breach of duty of good faith and fair dealing claim; and (4) a breach of fiduciary duty claim. Fifth Third moves for judgment on the pleadings on all claims against it in EMS's Complaint. Its arguments will be addressed, in turn, below.

Because a federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state, *Land v. Yahama Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001), Indiana choice of law rules must be applied in this case. "Indiana choice of law doctrine favors contractual stipulations as to governing law." *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162

3

(Ind. 2002). Here, the parties' contract explicitly states that "[t]his Agreement will be governed by and construed in accordance with the laws of the State of New York." Dkt. No. 1-2 at 18. Accordingly, this Court will apply New York law.

### A. Frustration of Purpose

Count I of EMS's Complaint claims the commercial purpose of the swap was frustrated due to the credit crisis of 2008, and therefore EMS is entitled to restitution for the amounts it paid to Fifth Third in connection with the swap agreement. "The doctrine [of frustration of purpose] applies when a change in circumstances makes one party's performance virtually worthless to the other, [thereby] frustrating his purpose in making the contract." *Morpheus Capital Advisors LLC v. UBS AG*, 962 N.Y.S.2d 82, 85 (N.Y. App. Div. 2013) (quoting *PPF Safeguard, LLC v. BCR Safeguard Holding, LLC*, 924 N.Y.S.2d 391, 394 (N.Y. App. Div. 2011)). Typically, a party raises frustration of purpose as a defense for nonperformance once a breach of contract claim is asserted against it: "For a party to a contract to invoke *frustration of purpose as a defense for nonperformance*, 'the frustrated purpose must be so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense.'" *PPF Safeguard*, 924 N.Y.S.2d at 394 (quoting *Crown IT Servs., Inc. v. Koval-Olsen*, 782 N.Y.S.2d 708, 711 (N.Y. App. Div. 2004) (emphasis added)). Fifth Third thus argues that Count I, which seeks restitution damages given that EMS has already performed its part of the swap agreement, is not a valid cause of action. It cites *Mariott Int'l Inc. v. Western Talent Corp.* in support which held that "[f]rustration of purpose is not a viable cause of action." No. 602567/07, 2008 N.Y. Misc. LEXIS 8106, at *11 (N.Y. Sup. Ct. Nov. 5, 2008).

EMS disagrees, citing several cases that purportedly have allowed affirmative claims for frustration of purpose and recovery of damages. As an initial matter, three of the cases EMS

4

cites are unpersuasive as they are not New York cases nor are they cases applying New York law. *See Resolution Trust Corp. v. Fed. Sav. & Loan Ins. Corp.*, 25 F.3d 1493 (10th Cir. 1994); *Walker v. Cont'l Life & Accident Co.*, 445 F.2d 1072 (9th Cir. 1971); *Jabero v. Harajli*, No. 243494, 246737, 2004 WL 1335896 (Mich. Ct. App. June 15, 2004).[2] The other two cases EMS cites are equally unavailing to its claim that frustration of purpose can be asserted as an affirmative claim, and not simply used as a defense for nonperformance.

EMS first cites *Murphy-Hoffman Company v. Bank of America, N.A.*, a Western District of Missouri case that applied New York law, in support of its argument that frustration of purpose is a viable claim. No. 09-00227-CV-W-FJG, 2009 WL 2524773 (W.D. Mo. Aug. 14, 2009). *Murphy-Hoffman* dealt with an interest rate swap agreement, like the one present in the case at bar, and ultimately denied Bank of America's motion to dismiss Murphy-Hoffman's frustration of purpose claim. The problem for EMS is that while the Western District of Missouri ultimately denied Bank of America's motion to dismiss, it expressed doubt as to if a frustration of purpose claim even existed. The court noted that, "BOA [Bank of America] *apparently acknowledges a cause of action based on frustration of purpose exists*[.]" *Id.* at *3 (emphasis added). The Court agrees with Fifth Third, therefore, that the parties in *Murphy-Hoffman* seemingly conceded that a frustration of purpose claim existed; however, the court expressed doubt as to if that was actually true. *Murphy-Hoffman*, therefore, does not stand for the proposition that frustration of purpose is a viable claim under New York law.

---

[2] The Court notes that even if these cases were persuasive, two are factually different. In *Resolution Trust*, investors sought to rescind a contract to acquire an institution *before* they actually acquired that institution. Similarly, in *Jabero*, the Plaintiff sought restitution of his $50,000 deposit because *the parties never closed on the transaction*. In other words, neither of these contracts were fully performed, as is the case at bar.

EMS next cites *D & A Structural Contractors Inc. v. Unger*, in support of its claim that after frustration of purpose has been found, restitution is often warranted. 901 N.Y.S.2d 898 (N.Y. Sup. Ct. 2009). While the Court agrees with EMS that this is true, this case does not lend any support to EMS's case, as it is factually different from EMS's current situation. In *D & A*, Mrs. Unger contracted with the plaintiff to perform certain repairs on her home after it was damaged in a fire; payments were to be made from her insurance company. During the course of the repairs, a judge issued a temporary restraining order preventing Mrs. Unger from transferring any assets, including insurance proceeds, due to a pending divorce action with Mr. Unger. Because of this, D & A sued Mrs. Unger for breach of contract. The court found that because the insurance proceeds were no longer available for payment, the purpose of the contract was frustrated. In other words, Mrs. Unger's nonperformance was excused. It found, however, that D &A was entitled to certain restitution payments for work performed and materials bought; otherwise, as the court noted, Mrs. Unger would receive a windfall in obtaining repairs on her home that she did not pay for.

The Court agrees with Fifth Third that "[t]his is the precise opposite of Plaintiffs' claim, where Plaintiffs seek to use 'frustration of purpose' to claim damages for themselves." EMS is not asserting frustration of purpose as a defense to a breach of contract claim brought by Fifth Third, as was the case in *D & A*; rather, EMS has fully performed the contract, and now seeks damages for itself. EMS has not directed the Court to any New York case where frustration of purpose was successfully asserted as an affirmative claim in order to receive damages after the parties had fully performed the contract.

It appears to the Court that frustration of purpose is properly asserted as an affirmative defense when a party seeks to excuse his nonperformance. Section 265 of the Restatement (Second) of Contracts, which EMS cites in its brief, provides:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, *his remaining duties to render performance are discharged*, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 265 (1981) (emphasis added); *see also, e.g.*, *Turbines Ltd. v. Transupport, Inc.*, 825 N.W.2d 767, 776-77 (Neb. 2013) ("We therefore conclude as a matter of law that the doctrine of discharge by supervening frustration as set forth in § 265 of the Restatement cannot serve as the basis for rescission of a contract that has been fully performed."). In this instance, EMS is not seeking to excuse its nonperformance, but rather asserts frustration of purpose as a means to recover damages, which is not a viable claim. Accordingly, Fifth Third's motion is **GRANTED** with respect to EMS's frustration of purpose claim.

### B. Mutual Mistake

Count II of EMS's Complaint claims that the financial crisis of 2008 caused both parties to be mutually mistaken about material facts that they relied on in entering into the swap agreement. It therefore seeks a rescission of the swap agreement and a mutual exchange of payments the parties made to each other. Fifth Third argues that EMS has failed to state a claim for which relief can be granted because under New York law, a mutual mistake has to relate to a past or present fact, *not* a prediction or a future event. *See Simkin v. Blank*, 968 N.E.2d 459, 462 (N.Y. 2012) ("We have explained that '[t]he mutual mistake must exist at the time the contract is entered into and must be substantial.'") (quoting *Matter of Gould v. Bd. of Educ. of Sewanhaka*

7

*Cent. High Sch. Dist.*, 616 N.E.2d 142, 146. (N.Y. 1993)). Because the parties' "mistake" was that the LIBOR rate would track the corporate bond rates, a prediction of a future event, it argues that EMS cannot allege a claim for mutual mistake.

EMS responds by arguing that Fifth Third misunderstands its claim. It "alleges that the parties were mutually mistaken about the fact that the LIBOR-based rate used in the swap agreements was the appropriate rate to hedge the 7-day floater bond rates on EMS's corporate debt." Pl.'s Response at 15. In other words, it argues that the parties were mistaken about a present fact—that the "LIBOR was an appropriate mechanism to hedge EMS's variable corporate bond rates." *Id*. at 17.

The problem with this argument is that the reason EMS thought the interest rate swap agreement would be an appropriate mechanism to hedge the variable interest rate is because it thought the LIBOR would continue to move in tandem with the corporate bond rate. At its core, this is a prediction of a future event which, as Fifth Third correctly notes, cannot support a mutual mistake claim. *See Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 994 (S.D.N.Y. 1989) ("However, a party's prediction or judgment as to events to occur in the future, even if erroneous, is not a mistake[.]") (internal quotation marks omitted). Inasmuch as EMS's claim of mutual mistake is based on events that transpired after the swap agreement was entered into, the Court **GRANTS** Fifth Third's motion for judgment on the pleadings on Count II of EMS's Complaint as a matter of settled New York law.

### C. Breach of Duty of Good Faith and Fair Dealing

Count III of EMS's Complaint alleges that Fifth Third breached its duty of good faith and fair dealing by: 1) enforcing the terms of the swaps, after the commercial purpose of the swaps was frustrated due to the unexpected credit crisis; 2) failing to provide a full, complete, and

accurate accounting and to provide its methodology for its ongoing charges, as well as its failure to meet face-to-face with EMS, notwithstanding EMS's repeated requests for information; 3) suddenly and unilaterally terminating the parties' banking relationship, including the interest rate swap agreement; 4) insisting on payment of the early termination fees, when the purposes of the swaps had been frustrated and at a point when the LIBOR was artificially depressed through no fault of EMS; and 5) demanding payment of the early termination fees as a condition to release of EMS's collateral, forcing EMS to pay the fees under duress. Complaint ¶ 81.

The Court notes that "under New York law, 'all contracts imply a covenant of good faith and fair dealing in the course of performance . . . encompass[ing] any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" *Mount Sinai Hosp. v. 1998 Alexander Karten Annuity Trust*, 970 N.Y.S.2d 533, 541 (N.Y. App. Div. 2013) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 501 (N.Y. 2002)). With this in mind, the Court turns to Fifth Third's arguments.

*1. Enforcing the Terms of the Agreement*

In its Complaint, EMS alleges that Fifth Third breached its duty of good faith and fair dealing by enforcing the terms of the swap agreement even after the 2008 credit crisis. Fifth Third argues that because it had the contractual right to enforce the swap agreement, EMS fails to state a claim, as its duty of good faith and fair dealing cannot negate the explicit rights in the contract. While this is true,

> New York courts have repeatedly affirmed that a party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain.

9

*Gross v. Empire Healthchoice Assur., Inc.*, No. 602848-2005, at *3 (N.Y. Sup. Ct. July 18, 2007); *see also Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 587 (N.Y. App. Div. 2003) ("[T]he allegations here clearly go beyond claiming only that [the Defendant] should be precluded from exercising a contractual right; they support a claim that [the Defendant] exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits of the joint venture[.]").

EMS argues that Fifth Third breached its duty of good faith and fair dealing when it "acted in a manner that, although may not have been expressly forbidden by the parties' contractual arrangement, deprived EMS of the right to receive the benefits of the parties' bargain." Pl.'s Response at 22. In other words, EMS is claiming that Fifth Third acted in bad faith when it continued to enforce the swap agreement after the 2008 credit crisis, thus depriving EMS of its benefits under the swap agreement. The Court cannot find as a matter of law that EMS has not stated a plausible claim.

## 2. *Failing to Provide a Full, Complete, and Accurate Accounting*

EMS also alleges that Fifth Third breached its duty of good faith and fair dealing by failing to provide a full, complete, and accurate accounting and failing to meet face-to-face with EMS. Fifth Third argues that: 1) EMS does not allege any damages resulting from this failure; and 2) EMS has not identified which contractual term obligated Fifth Third to take such actions. EMS responds by alleging it was damaged in that its own personnel had to dedicate hundreds of hours to conduct its own investigation into the swap agreement transactions, revealing, as it alleges, that EMS was over-charged for the swap-related fees. Complaint ¶ 48. These damages are sufficient to state a claim. Further, the Court agrees with EMS that under the circumstances, it was not unreasonable for EMS to assume that Fifth Third had an implied duty to provide

accurate information to EMS regarding the swap transactions it contracted for. *See 511 W. 232nd Owners Corp.*, 773 N.E.2d at 500-01 ("While the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship they do encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included.") (internal citations and quotation marks omitted). EMS has alleged sufficient facts to state a plausible claim.

> 3. *Terminating the Banking Relationship; Forcing EMS to Pay Early Termination Fees; and Withholding Collateral*

In its Complaint, EMS claims that Fifth Third breached its duty of good faith and fair dealing when it unilaterally terminated the parties' banking relationship, forced EMS to pay early termination fees, and withheld collateral until EMS paid such fees. Complaint ¶ 81. Fifth Third again argues that because it had the right to terminate the relationship, impose certain termination fees, and withhold EMS's collateral pending payment of all amounts due under the swap agreement, EMS fails to state a claim.[3] Again, as noted above, even if Fifth Third had the right to take those actions, EMS claims it unreasonably exercised these rights in bad faith. *See* Complaint ¶ 54 ("At the time Fifth Third triggered the early termination of the swaps, EMS was not in default on any of its obligations under the swaps, nor did any other valid basis for terminating the swaps exist."); *id.* ¶ 56 ("Despite Fifth Third's unilateral termination of the banking relationship with EMS, Fifth Third refused to release EMS's collateral unless EMS paid 'Early Termination Fees' in connection with the swaps."); Pl.'s Response at 26 ("Fifth Third engaged in unreasonable, oppressive, and underhanded conduct in unilaterally terminating the parties' banking relationship and the swap agreements . . . Fifth Third then demanded payment of

---

[3] The Court notes that Fifth Third has failed to direct the Court to the specific provisions of the agreement where it authorizes Fifth Third to take such actions.

the early termination fees as a condition to release EMS's collateral, forcing EMS to pay the fees under duress."). Taking all the facts as true for the purposes of this ruling, EMS has alleged sufficient facts to state a plausible claim that Fifth Third breached its duty of good faith and fair dealing in terminating their banking relationship, including the swap agreement, imposing early termination fees, and withholding EMS's collateral.

### D. Breach of Fiduciary Duty

Finally, Count VI of EMS's Complaint alleges that Fifth Third breached its fiduciary duty by, among other things, failing to disclose the risks of entering into an interest rate swap agreement, terminating the swap agreement, demanding payment of early termination fees, and refusing to release EMS's collateral until those fees were paid. Fifth Third argues that EMS explicitly disclaimed any fiduciary duty, directing the Court to this provision in their ISDA agreement:

> **No Reliance.** In connection with the negotiation of, the entering into, and the execution of, this Agreement, any Credit Support Document to which it is a party, and each Transaction hereunder, *Party B acknowledges and agrees that: (i) Party A is acting for its own account and is not acting as a fiduciary for, or a financial or investment advisor to Party B* (or in any similar capacity); (ii) Party B is not relying upon any communications (whether written or oral) from Party A as investment advice or as a recommendation to enter into this Agreement, any Credit Support Document to which it is a party and each Transaction hereunder (other than the representations expressly set forth in this Agreement and in such Credit Support Document), it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction; (iii) Party B has not received from Party A any assurance or guarantee as to the expected results of any Transaction; and (iv) *Party B has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own independent investment, hedging, and trading decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by Party A.*[4]

---

[4] "Party A" refers to Fifth Third, and "Party B" refers to EMS.

Dkt. No. 1-2 at 20 (emphasis added).[5] In response, EMS argues: 1) it did not knowingly disclaim any and all fiduciary duties owed by Fifth Third; and 2) the breach of fiduciary allegations contained in its Complaint are broader than the scope of the above disclaimer.

Under New York law, waivers of fiduciary duties are upheld "[w]hen parties, particularly sophisticated business entities, enter into an arm's-length business transaction.[.]" *JP Morgan Chase Bank, N.A. v. Controladora Comercial Mexicana S.A.B. De C.V.*, No. 603215/08, 2010 WL 4868142, at *10 (N.Y. Sup. Ct. Mar. 16, 2010). EMS thus argues that it "is not a sophisticated investor familiar with complex derivative financial instruments such as interest rate swaps," Pl.'s Response at 31, and that it "reasonably relied on Fifth Third to advise it regarding all aspects of its corporate debt." Complaint ¶ 20. In other words, EMS argues that the Court cannot grant judgment on the pleadings as to this claim because it has raised factual issues regarding whether it knowingly disclaimed Fifth Third's fiduciary duties.

Fifth Third replies that this it is implausible to believe that EMS is an unsophisticated party because EMS issued ten million dollars in corporate bonds and financed the purchase of a corporate jet. The Court disagrees. For the purposes of this motion, it takes the facts in EMS's Complaint as true. Simply because EMS issued corporate bonds to finance the purchase of a jet does not mean it was a sophisticated party with regard to interest rate swap agreements. EMS has alleged it was not, and the Court must accept this is true at this stage of the case.

EMS also argues that its claim for breach of fiduciary duty is broader than that which Fifth Third claims it disclaimed. The portion of the agreement on which Fifth Third relies applies to "the negotiation of, the entering into, and the execution of" the swap agreement. Dkt. No. 1-2 at 20. EMS's Complaint also alleges breach of fiduciary duty by terminating the

---

[5] The italicized portions of this provision are the specific portions Fifth Third claims support its position that EMS disclaimed any fiduciary duties.

banking relationship early, imposing significant early termination fees, and refusing to release certain collateral. These actions are not covered by the ISDA agreement. For these reasons, Fifth Third's motion for judgment on the pleadings is **DENIED** on Count IV.

## IV. CONCLUSION

For the foregoing reasons, the Defendant's motion for judgment on the pleadings (dkt. no. 37) is **GRANTED IN PART AND DENIED IN PART**.

SO ORDERED: 03/07/2014

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication