UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| EXECUTIVE MANAGEMENT | ) | |
| SERVICES, INC., et al., | ) | |
| | ) | |
|    Plaintiffs, | ) | |
| | ) | |
|      vs. | ) | Cause No.  1:13-cv-582-WTL-MJD |
| | ) | |
| FIFTH THIRD BANK, | ) | |
| | ) | |
|    Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's Motion for Summary Judgment (Dkt.

No. 268).  The motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion

for the reasons set forth below.[1]  In addition, the Court **GRANTS** the Plaintiffs' motion for leave

to file oversized brief (Dkt. No. 288) and the Plaintiffs' motion for leave to file a surreply (Dkt.

No. 320).  **The Clerk is directed to file the Plaintiffs' surreply (found at Dkt. No. 320-1)**, and

the Court has considered the surreply in its entirety in ruling on the motion for summary

judgment.  The Plaintiffs' motion for a hearing on the motion for summary judgment (Dkt. No.

---

[1]Because the Court finds that the Plaintiffs' claims fail on other grounds, the Court need
not, and therefore does not, address the Defendant's argument that certain of the Plaintiffs'
claims are barred by the applicable statute of limitations or the Defendant's argument that
Plaintiff Air Golf II, LLC, has no viable claim because it was not a party to the transactions that
form the basis of the Plaintiffs' claims.  With regard to the latter argument, however, the Court
notes that the Plaintiffs argue in response that their damages expert "has opined that Air Golf
incurred at least $208,156 in rescission-based damages in this case" plus prejudgment interest.
Dkt. No. 321-1 at 8.  This argument is without merit.  The expert's opinion with regard to Air
Golf amounts to nothing more than a calculation of what Air Golf paid under its swap agreement
(plus prejudgment interest) and, therefore, what it would be entitled to recover if the contract
were rescinded; the expert in no way purports to demonstrate that Air Golf actually suffered any
injury as a result of its relationship with the Defendant.

321) is **DENIED.**  The parties have had more than ample opportunity to explain their positions in their (oversized) briefs.[2]  The parties' motions to exclude expert testimony at trial (Dkt. Nos. 329, 330, and 332) are each **DENIED AS MOOT**.

## I. <u>STANDARD</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor.  *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Hemsworth*, 476 F.3d at 490.  Summary judgment is appropriate only if no reasonable trier of fact could find in the non-movant's favor.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625 (7th Cir. 2011).  Finally, and of particular relevance in cases such as this one which involve voluminous evidentiary submissions and very lengthy statements of fact, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "a court is not required to scour the record in

---

[2]This denial is not based on the untimeliness of the Plaintiffs' motion seeking oral argument; the Court recognizes and accepts the Plaintiffs' argument that the content of the Defendant's reply brief led the Plaintiffs to believe that oral argument would be helpful to the Court.  The Court, however, disagrees with that conclusion.

search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II. <u>FACTS</u>

The relevant facts of record, viewed in the light most favorable to the Plaintiffs, as the non-moving parties, are as follows.[3]  The Court has omitted some facts that, while included in a party's statement of fact, are not relevant to the Court's ruling.

Plaintiff Executive Management Services, Inc., ("EMS") is a company that provides commercial janitorial services.  David Bego is the founder, president, and CEO of EMS, which he started in 1989.  In addition to EMS, Bego is the principal in numerous other companies that he has started and acquired over the years, including the remaining Plaintiffs in this case:  EMS Florida, Inc. ("EMS Florida"), an affiliate of EMS that does business in Florida; D&B Ventures, LLC ("D&B"), a real estate holding company that owns commercial real estate in multiple states; and Air Golf II, LLC ("Air Golf"), which owns a corporate jet that Bego's companies use for business purposes.

The Plaintiffs' banking relationship with Defendant Fifth Third Bank ("Fifth Third") began in July 2004, when Air Golf borrowed money from Fifth Third to purchase an airplane.[4]  That loan agreement provided for a floating interest rate based on the prime rate.  In September

---

[3]The Court notes that very few of the facts asserted by the Defendant were properly disputed by the Plaintiffs in their response brief, because instead of clearly identifying the material facts they believed to be in dispute, the Plaintiffs chose to offer their own competing statement of facts.  The Court nonetheless has endeavored to wade through the approximately forty pages of facts and over 2500 pages of evidentiary materials offered by the parties and arrive at a set of relevant facts that are supported by the evidence of record and either asserted by the Defendant and not properly disputed by the Plaintiffs and/or asserted by the Plaintiffs.

[4]For many years prior to July 2004, the Plaintiffs did their banking with Bank One, which merged with JPMorgan Chase in 2004.  Bego became dissatisfied with Bank One/Chase after the merger and chose Fifth Third as the new bank for his companies.

and October of that year, the Plaintiffs and Fifth Third entered into a number of standard loan agreements, including one for a revolving line of credit at a floating rate of interest based on the prime rate (hereinafter referred to as the "Line of Credit") that was entered into by the three Plaintiffs other than Air Golf (hereinafter referred to collectively as "the EMS Plaintiffs"). The parties also entered into a variety of security agreements, mortgages, and other standard loan-related contracts.

In October 2004, the EMS Plaintiffs worked with Fifth Third to obtain financing in the form of variable rate demand notes ("VRDNs," also sometimes referred to as bonds) in order to fund the EMS Plaintiffs' operations and acquisitions and to refinance some of the Plaintiffs' existing debt. The EMS Plaintiffs relied on Fifth Third to advise them regarding the financial aspects and risks of the VRDNs. Fifth Third did not explain to the EMS Plaintiffs the risks associated with the VRDNs, including how the variable interest rates were set or the potential impact of changes in Fifth Third's credit rating on those rates, and did not provide them with written disclosures regarding VRDNs or their risks.

Under the terms of a VRDN, a bank—in this case, Fifth Third—issues a letter of credit to guarantee bonds that are issued by a commercial customer of the bank—in this case, the three Plaintiffs. The bonds are sold (or "remarketed") to investors in a weekly auction process and bear variable interest rates, re-set weekly, that are tied to the bank's credit rating, rather than that of the customer. Fifth Third had also offered the EMS Plaintiffs a conventional term loan, but the EMS Plaintiffs chose the VRDN option because the interest rates were lower. The 2004 VRDN transaction authorized issuance of up to $10 million in bonds; $3.75 million were issued by the EMS Plaintiffs in October 2004. The transaction was consummated by means of the following documents:

(1) a Trust Indenture (with Bank of New York Mellon), dated October 1, 2004, authorizing the issuance of up to $10 Million in VRDNs/bonds;

(2) a Reimbursement and Pledge Agreement (between the EMS Plaintiffs and Fifth Third), dated October 1, 2004;

(3) a Credit Agreement (between the EMS Plaintiffs and Fifth Third), dated October 1, 2004;

(4) a Note Purchase Agreement (between the EMS Plaintiffs, Fifth Third, and Fifth Third Securities, which served as the underwriter for the VRDNs); and

(5) a Remarketing Agreement (between the EMS Plaintiffs and Fifth Third Securities), dated October 1, 2004, pursuant to which Fifth Third Securities served as the remarketing agent and in that capacity was responsible for, among other things, periodically calculating the applicable interest rates on the VRDNs.

The law firm Bose McKinney & Evans LLP ("BME") represented the EMS Plaintiffs in connection with the VRDN transactions.  BME billed the EMS Plaintiffs over $68,000 for this work.  As described by BME, "[g]iven the complicated nature of the transaction, it required both [BME's] lending attorneys to represent the client in the completion of the lending documents, and [BME's] bond attorney to assist in the structuring of the lower floater bonds which were used as the liquidity source for the financing."  Dkt. 289-17 at 6 [BME Depo. at 38].  Fifth Third understood that BME's role was "documentation review and legal opinion," not "heavy negotiations" on behalf of the EMS Plaintiffs.  Dkt. No. 290-10.

As part of its role as counsel to the EMS Plaintiffs, BME participated in drafting the Offering Circular that was used to describe the details of the VRDNs to potential purchasers of the bonds.  The Offering Circulars detailed how the interest rates for the VRDNs were set and highlighted the fact that they were being sold based on the strength of Fifth Third's credit, including the following statement "**THE NOTES ARE BEING OFFERED ON THE BASIS**

**OF THE LETTER OF CREDIT AND NOT ON THE BASIS OF THE FINANCIAL STRENGTH OF THE ISSUERS.**" Dkt. No. 231-3 at 70 (emphasis in original).[5]

In 2004 and 2005, the Federal Reserve raised its target for the Fed Funds rate thirteen times, from 1.00% to 4.25%. Consequently, the variable interest paid by the EMS Plaintiffs on their VRDNs, as well as their other floating rate debt, increased over that time period. In January 2006, Tom Ritter of Fifth Third's Capital Markets Group traveled to EMS's headquarters in Indianapolis and met with Bego to discuss using interest rate swaps as a means for EMS to "convert" the variable rates on its VRDNs into effective fixed rates. Fifth Third was aware that Bego had previously entered into an interest rate swap with Bank One.

An interest rate swap is a mechanism for converting a borrower's variable interest rate to a commercially reasonable effective fixed rate. The parties entering into the agreement select a hypothetical monetary amount, known as the "notional amount," which is simply used to calculate the parties' obligations to each other. One party then agrees to pay the other a fixed rate of interest on the notional amount and the other party agrees to pay a floating interest rate derived from an index such as the London Interbank Offered Rate ("LIBOR"). During the January 2006 meeting, Ritter presented a slide show to Bego that generally described interest rate swaps and explained that under the proposed swap the interest rate the EMS Plaintiffs would be receiving would be the 30-day LIBOR rate. The LIBOR rate is a widely published rate

---

[5]The Plaintiffs inexplicably urge the Court to "strike and/or disregard all of Fifth Third's facts and arguments relating to the Offering Circular language" because "Fifth Third cites/offers no evidence that EMS reviewed the Offering Circular or saw the quoted language." However, the Plaintiffs do not dispute the fact that their own legal counsel reviewed the Offering Circular and participated in its drafting, nor do they dispute that the Offering Circular contained the quoted language. Whether the Plaintiffs had actual or imputed knowledge of the information disclosed in the Offering Circular is a separate question from what the Offering Circular said; the latter is an undisputed fact of record, and there is no basis for "striking" or "disregarding" that fact.

available from many sources; it is not the same rate as the EMS Plaintiffs were paying on their VRDNs, as that rate was tied to Fifth Third's credit rating.  Ritter represented to Bego that the proposed swaps would provide the EMS Plaintiffs with an "all-in fixed rate" on its corporate debt—i.e., that the swaps would have the effect of replacing the variable rates on the EMS Plaintiffs' corporate debt with fixed rates.  Ritter had not reviewed the EMS Plaintiffs' corporate debt structure or had conversations with anyone at EMS before he gave the presentation to Bego.

The risk that the LIBOR-based rate on the swap will diverge from the variable interest rate on the associated VRDN is known as the "basis risk."  Fifth Third never explained or disclosed to the EMS Plaintiffs the nature or potential magnitude of the basis risk associated with the EMS Plaintiffs' interest rate swaps, either before, during, or after the January 2006 meeting.[6] Indeed, other than the slide presentation, Fifth Third did not provide the EMS Plaintiffs with any written explanation or disclosures regarding interest rate swaps or their risks.[7]

The EMS Plaintiffs did not consult with legal counsel, an accountant, or a financial advisor in connection with the Fifth Third interest rate swaps, from early-2006 through at least late-2008.[8]  Bego believed that Fifth Third was advising it regarding, and recommending that it

---

[6]The swap Bego had previously entered into with Bank One was based on the prime rate and was used to hedge the variable rate risk on a prime-based loan. Accordingly, the variable rate components of the Bank One swap and the loan cancelled each other out, meaning there was no "basis risk" as there was with the Fifth Third LIBOR-VRDN swaps.

[7]The Plaintiffs assert that the slide show presentation was "deficient and misleading in numerous respects," Dkt. No. 287 at 17; however, the specifics of their allegation are not relevant to the Court's ruling.

[8]The Plaintiffs ask the Court to strike and disregard Fifth Third's assertion that the Plaintiffs had the ability to consult with their attorneys and/or their in-house or outside accountants with regard to the interest rate swaps because "there is no evidence that any of [the Plaintiffs'] other professional service providers even had the *ability* to advise [the Plaintiffs] regarding the interest rate swaps." Dkt. No. 287 at 19 n.14 (emphasis in original).  The issue is not whether those legal and accounting professionals had the requisite knowledge to provide the Plaintiffs with all of the advice they needed with regard to the swaps, however.  If they did not,

enter into, the swaps.  Ritter did and said nothing during his presentation for the purpose of dissuading Bego from believing that he was providing such advice.

In January 2006, the EMS Plaintiffs executed an interest rate swap on a notional amount of $2,046,833.  The swap was governed by an ISDA Master Agreement, which is a standard agreement prescribed by the International Swap Dealers Association; as such, it was substantially identical to the ISDA Agreement that Bego had previously executed with Bank One.  Ritter does not recall discussing any of the terms of the Master Agreement or accompanying Schedule with the EMS Plaintiffs, including the disclaimer provisions.

Pursuant to the January 2006 ISDA Agreement and Schedule, the EMS Plaintiffs agreed to receive LIBOR from Fifth Third and agreed to pay a fixed rate of 5.27% to Fifth Third. Therefore, if the LIBOR rate was greater than 5.27%, Fifth Third would pay the EMS Plaintiffs; if not, the EMS Plaintiffs would pay Fifth Third.  At the time the EMS Plaintiffs entered into the ISDA Master Agreement in January 2006, LIBOR-based interest rate swaps were widely used to hedge interest rate risk by entities such as the EMS Plaintiffs that had issued taxable VRDNs backed by bank letters of credit.  LIBOR had historically been strongly correlated with interest rates on such VRDNs, generally varying by only a few basis points (hundredths of a percent). Moreover, there was no commercially available index that precisely matched the rates Fifth Third customers paid on VRDNs.

The ISDA Agreement that the EMS Plaintiffs signed in January 2006 contained numerous representations and warranties. These did not appear in the standard section of the

those professionals would have been obligated to "know what they did not know" and to advise the Plaintiffs to seek advice from someone who was qualified to give it.

Master Agreement, but in the Schedule that is customized between the parties.  Included in the

disclaimers was the following:

> **No Reliance.**  In connection with the negotiation of, the entering into, and the
> execution of, this Agreement, any Credit Support Document to which it is a party,
> and each Transaction hereunder, [EMS] acknowledges and agrees that: (i) [Fifth
> Third] is acting for its own account and is not acting as a fiduciary for, or a
> financial or investment advisor to [EMS] (or in any similar capacity); (ii) [EMS]
> is not relying upon any communications (whether written or oral) from [Fifth
> Third] as investment advice or as a recommendation to enter into this Agreement,
> any Credit Support Document to which it is a party and each Transaction
> hereunder (other than the representations expressly set forth in this Agreement
> and in such Credit Support Document), it being understood that information and
> explanations related to the terms and conditions of a Transaction shall not be
> considered investment advice or a recommendation to enter into that Transaction;
> (iii) [EMS] has not received from [Fifth Third] any assurance or guarantee as to
> the expected results of any Transaction; and (iv) [EMS] has consulted with its
> own legal, regulatory, tax, business, investment, financial, and accounting
> advisors to the extent it has deemed necessary, and it has made its own
> independent investment, hedging, and trading decisions based upon its own
> judgment and upon any advice from such advisors as it has deemed necessary and
> not upon any view expressed by [Fifth Third].

Dkt. No. 231-3 at 114 (using "EMS" throughout to refer to the EMS Plaintiffs).

After they executed the January 2006 swap, the EMS Plaintiffs received, in addition to

weekly interest rate notices on their VRDNs, monthly rate reset notices advising them of the

LIBOR rates that Fifth Third was paying them under the swaps.  Both the VRDN weekly interest

rate notices and the LIBOR rate reset notices provided a phone number for the EMS Plaintiffs to

call if they had any questions about their statements.  Thus, the EMS Plaintiffs were regularly

apprised of changes in both LIBOR and their VRDN rates.

Over the next several years, the Plaintiffs and Fifth Third entered into several additional

swap transactions in varying amounts, documented by successive Confirmations.

- In May 2006, Air Golf entered into a swap in conjunction with purchasing a larger
  airplane.  The notional amount was $1,445,000; Air Golf agreed to pay a fixed rate of

5.73% and to receive LIBOR from Fifth Third.  Concurrently, Air Golf entered into an Aircraft Purchase Term Note in the same amount, at an interest rate of LIBOR plus 2.25%.  This swap had an expiration date of May 15, 2011.

- In September 2007, in connection with another corporate acquisition, the EMS Plaintiffs issued an additional $1.5 million in bonds under the VRDN.  At about the same time, they entered into an interest rate swap in the notional amount of $1,500,000.  They agreed to pay a fixed rate of 4.95% and to receive LIBOR from Fifth Third.  This swap had an expiration date of October 1, 2012.

- In January 2008, the EMS Plaintiffs entered into an interest rate swap with the notional amount of $4,059,039.  They agreed to pay a fixed rate of 3.79% and to receive LIBOR.  This swap also had an expiration date of October 1, 2012.

- Finally, in April 2008, in conjunction with another corporate acquisition, the EMS Plaintiffs entered into a fourth interest rate swap in the notional amount of $5,250,000.  They agreed to pay a fixed rate of 3.77%, to commence on September 1, 2008, and to receive LIBOR from Fifth Third.  This swap had an expiration date of September 1, 2015.

Each of these interest rate swaps was governed by the ISDA Master Agreement and Schedule that was executed between the parties in January 2006.  Each swap transaction was executed by the EMS Plaintiffs' acceptance over a recorded telephone call, which Fifth Third characterized as a "legally binding oral agreement."  Each transaction was subsequently memorialized by a written Confirmation that set out the details of the transaction.  Each Confirmation contained the following provision:

1. Each party represents and warrants to the other party as follows:

(a) Such party is fully informed of and capable of evaluating, and has evaluated the potential financial benefits and risks, the tax and accounting implications, the appropriateness in light of its individual financial circumstances, business affairs, and risk management capabilities, and the conformity to its policies and objectives, of this Transaction;

(b) Such party has entered into this Transaction in reliance only upon its own judgment. Neither party holds itself out as advising, or any of its employees or agents as having the authority to advise, the other party as to whether or not it should enter into this Transaction and neither party should have any liability whatsoever in respect of any advice of such nature given, or views expressed, by it or any such persons to the other party, whether or not such advice is given or such views are expressed at the request of the other party.

Dkt. No. 1-3 at 1.  Nonetheless, the EMS Plaintiffs relied on Fifth Third's superior knowledge and expertise regarding interest rate swaps, VRDNs, market interest rates, and related matters in following its advice and recommendations with regard to each of their swap transactions with Fifth Third.  Fifth Third did not provide the EMS Plaintiffs with updated risk or other information or disclosures before entering into any of the successive swap transactions.

Each time Fifth Third entered into an interest rate swap with the Plaintiffs, it entered into a "counter-swap" with another bank that contained the mirror-image of the terms of the Plaintiffs' swaps.  Fifth Third did this so that its position on each of the Plaintiffs' swaps was completely hedged—i.e., Fifth Third faced no risk on the swaps, because if it lost money on the Plaintiffs' swaps, it made the same amount on the associated counter-swap and vice versa.  Fifth Third did not disclose its counter-swap relationships to the Plaintiffs.

From October 2004 to September 2008, the VRDNs allowed the EMS Plaintiffs to pay substantially less interest than if they had borrowed from the Bank under conventional term loans.  In addition, from January 2006 to September 2008, the interest rate swaps acted as an effective hedge against the variable interest rates paid on the EMS Plaintiffs' other loans because, as had historically been the case, the LIBOR rates paid by Fifth Third pursuant to the

swaps closely tracked the rates on the VRDNs.   In the case of Air Golf, the interest rate it received under the swap matched the rate it paid on the loan; Air Golf paid LIBOR (plus a spread) on its airplane loan, and received LIBOR from Fifth Third under the swap. The EMS Plaintiffs' swaps were not as precisely correlated as Air Golf's, but the interest rates they paid on their VRDNs were generally within a few basis points of the LIBOR rates they received from Fifth Third under the swaps.   Accordingly, during that period, Bego believed that the swaps were accomplishing what they were intended to do—effectively replacing the variable interest rates on the EMS Plaintiffs' VRDNs with fixed rates.   This belief was consistent with an email Bego received from Tim Witmer, the "relationship manager" assigned to the Plaintiffs by Fifth Third, in June 2007, in which Witmer referred to "the all-in fixed rate" the EMS Plaintiffs were paying on their $6.5 million in outstanding bond debt and stated that because that rate was lower than the current prime rate, he "would not do anything with your current structure" with regard to that debt.

On March 13, 2008, Stephen Randle, the Managing Director of Fifth Third's Interest Rate Derivatives Group, circulated an email memorandum (the "March 2008 Memo") to numerous Fifth Third personnel, including Tim Witmer.   The March 2008 Memo bore the subject line:  "Recent Increase in VRDN Rates & Increased Swap Basis Risk."   It noted that turmoil in the credit market had recently caused a "sharp increase in VRDN rates" that had resulted in "a dislocation of the historical relationship/pricing correlation with the broader money market indexes of BMA/SIFMA and LIBOR."  Dkt. No. 253-1 at 3.   The memo concluded with the following discussion of "basis risk":

> "Basis" is the difference between the spot or current price/rate versus the future price/rate of a contract. "Basis Risk" is the risk to the hedger arising from uncertainty about the basis—the difference between spot and future prices/rates— at a future time. Therefore, basis risk on a swap contract wherein the client

counterparty is paying a fixed rate and receiving a floating rate index is the difference between the index rate they receive versus the floating/variable rate on the underlying debt.  Given that VRDN's prices/rates are predicated on the broader money market indexes of 1 M LIBOR for taxables and BMA/SIFMA on tax exempts, but not indexes in [and] of themselves, renders these securities susceptible to discreet pricing factors and dynamics which may be accentuated versus those factors affecting the broader, more liquid indexes. This basis risk proposed [sic] swap transaction with 5/3 clients is disclosed and analyzed in our presentations and discussions prior to the trade execution. Given the aforementioned historical average basis of 4 to 5 basis points over the indexes, the basis risk has been perceived to be nominal. The Interest Rate Risk Management department has recently discussed with client counterparties the potential to modify their swap contracts to decrease the current degree of basis spread/risk. Specifically, the client would receive from the Bank the index (i.e. 1 M LIBOR or BMA/SIFMA for taxable or tax exempt) plus the current observed basis spread or an average of the basis spread as experienced over the past 30 days.  Conversely, the client would pay the Bank the existing swap contract's fixed rate plus the basis spread they will receive over the index in order to maintain the fair value of the contract. Notably, the Bank would agree to future modification(s) (within reason) of the basis spread amount should the rate market environment alter resulting in a lowering of the effective basis risk (i.e. future reduction of the basis spread over the index received and the basis spread over fixed rate payed). The net result is a higher fixed rate and reduction in the basis risk/spread in the current rate/market environment.  The difficulty with this modfication [sic] approach is the somewhat arbitrary and potentially short term determination of the basis spread as the aforementioned monetary policy actions and the ultimate "digestion" of actual loss by the credit and financial market should facilitate a normallization [sic] of market function and risk/return valuation.  To date, clients have elected to maintain their current trade structure (i.e. index/pay fix rate) or execute new swap transactions without the current basis spread as the overriding belief is that the near term market conditions are "abberational" [sic] and unlikely to be sustained over an intermediate term and therefore a "reversion to the mean" of the historical relationship of VRDN rates to the predicate pricing indexes will be experienced.

*Id.*  In other words, there were alternatives to traditional swaps that were available to reduce the

basis risk, but those alternatives required the borrower to pay a higher fixed interest rate, and the

consensus at the time seemed to be that the market conditions creating the divergence in rates

were temporary and that things would return to their previous norms.  The March 2008 Memo

was subsequently forwarded and circulated to various other individuals and groups within Fifth

Third, and by March 26, 2008, it had been designated "**for INTERNAL use only**" by Fifth Third upper-management.

On April 4, 2008, the EMS Plaintiffs entered into their fourth LIBOR-based swap, the largest to date, with a $5,250,000 notional amount.  Fifth Third did not disclose to the EMS Plaintiffs the information contained in the March 2008 Memo, including the "dislocation" of LIBOR and VRDN rates and the resulting increased basis risk on LIBOR-VRDN swaps before the EMS Plaintiffs entered into the swap.

September 2008 marked the beginning of a financial crisis in the United States, as a result of which "credit markets experienced unparalleled adverse events that were not anticipated by the most senior economists in the United States."  Dkt. No. 253 at ¶ 47.  As a result, VRDN interest rates, which had historically been lower than conventional bank lending rates, temporarily spiked in the Fall of 2008, before eventually settling down to more normal levels in late 2009.  During the same period, LIBOR declined to historic lows.  The combination of these two factors resulted in VRDN rates diverging from LIBOR in late 2008 and 2009, meaning that the swaps the EMS Plaintiffs had entered into were no longer effective hedges against fluctuations in VRDN rates.  In other words, the amount that the EMS Plaintiffs received from Fifth Third under the swaps—the LIBOR rate—was substantially lower than the amount of interest it had to pay on its VRDNs.  Thus, while the parties had anticipated that the two rates would effectively cancel one another out, leaving the EMS Plaintiffs paying only the fixed interest rate set in each swap (plus the fees it owed Fifth Third), the EMS Plaintiffs were left owing the fixed rate plus the unexpectedly substantial difference between the LIBOR interest rate Fifth Third paid it and the interest rates on its VRDNs.

When Bego received a rate notice from Fifth Third on September 17, 2008, that indicated

that the VRDN rate had risen from 2.95% the following week to 6.63%, Bego emailed Witmer to

inquire whether the rate was correct.  Dkt. No. 290-3. Having not received a satisfactory answer

from Witmer regarding what was happening, on September 22, 2008, Bego sent the following

email to Fifth Third's President, John Pelizzari:

> I need your assistance.  I received the weekly e-mail update on short term rates
> last Monday and the rates had risen from 2.95% to 6.63%.  EMS is protected on
> the acquisition loans due to the swaps, except from Sept. 18, 2008, till Oct. 1,
> 2008.  An even bigger concern is the airplane, which is still on the floating rate.
>
> I have had repeated conversations with Tim Witmer and Doug Dalton, that I
> wanted advanced warning if rates were going to rise so I could do a swap on the
> plane loan and avoid any rate increases.  I was assured this would happen.
>
> EMS is now looking at 3.68% increase in rates for the plane and the last two
> weeks of the acquisition monies before the swap begins.  I believe relief for EMS
> from 5/3 is in order.  EMS needs to be protected.
>
> I have sent several e-mails to [Witmer] over the last week and he has not been able to
> provide an answer.  I am concerned about 5/3 and EMS's exposure. I understand these
> are tough times for financial institutions, however I would appreciate up front
> information as to the status of 5/3 and what can be done to make EMS whole.  I look
> forward to hearing from you soon.

Dkt. No. 292-1.  The next day, Witmer sent the following email to Bego:

> After an extensive conference call yesterday afternoon, the lack of liquidity, based on last
> week's developments, has caused the bond market to lock up.  Again, this is not a 5/3
> issue alone but an industry issue.  Our peer banks are having the same issues.  For
> example, almost $170 billion was taken out of money-market mutual funds last week.
> To satisfy these redemptions, bonds were liquidated.  The lack of demand for bonds has
> caused the rates to increase.  Furthermore, the flight to Government Securities also
> negatively impacted the bond market.  Overall, this is extremely unprecedented.
>
> At the end of the day, we do not know when this market will return.  A lot depends on
> the Government's actions being contemplated this week. Even so, it's not a lock to
> alleviate the strain.
>
> The alternative is to convert the bonds to traditional, 30-day LIBOR based term loans,
> utilizing the current swaps (which are fine and still in place) and amortization schedules.

>I am gathering all of the swap rates currently in place and will outline what a new structure would resemble.  Basically, the potential change would simply be the funding of the loan (bond financing vs. traditional bank funding).
>
>Please let me know if you have any questions.

Dkt. No. 290-20 at 1.  Bego responded:  "So how does this impact my Swaps now?  There should be no increase in costs to EMS."  *Id.*  A few days later, on September 25, 2008, Bego received another rate notice from Fifth Third indicating that the VRDN rate had risen again, by more than 3.00%, to 10.00%.  Upon receiving this information, Bego emailed Witmer demanding "solid answers and numbers now!" Dkt. No. 290-21 at 1.  In response, Witmer again explained that the bond market had dried up, causing the bond rate to increase.[9]  He further explained that "the index to which the LIBOR swap matches itself (which is a 7 day bond rate) has been temporarily rendered ineffective because [of the] lack of bond purchasers" and that the two alternatives were "one, wait and see if there is a correction (depending on the government's response) or convert to traditional term loans."  Dkt. No. 291-1 at 1.

During the period from September into November 2008, Fifth Third made a number of proposals to the EMS Plaintiffs that involved replacing their VRDNs with LIBOR-based variable rate term loans.  This would have, in fact, left the EMS Plaintiffs with fixed interest rates on their debt, because the LIBOR-based swaps would have remained in effect.  These fixed interest rates

---

[9]The Plaintiffs make much of the fact that Witmer did not explain to Bego—and apparently did not understand himself at that point in time—that in addition to the fact that the market for bonds had dried up, Fifth Third's deteriorating credit rating also was contributing to the increasing interest rates on the VRDNs.  The Plaintiffs do not explain how this knowledge would have affected Bego's decisionmaking process or changed his behavior, however, so it is not clear how this failure on the part of Fifth Third is relevant to the Plaintiffs' claims.  In fact, while the Plaintiffs cite to evidence that Fifth Third's credit rating was lowered by Moody's in September 2008 and again in April 2009, they cite to no evidence that suggests to what extent and for how long that affected the interest rates on the VRDNs.

would have been somewhat higher than what Bego believed his effective fixed rates had been prior to the events of September 2008; for example, under the first proposal, made by Witmer in an email dated September 25, 2008, the EMS Plaintiffs' new rates would have been .85% higher than the old rates had been.[10]  The EMS Plaintiffs were unwilling to accept Fifth Third's LIBOR-based term loan proposals because they all included rates that were higher than the rates Bego believed they had "locked in" pursuant to the swaps.  Thus, Bego responded to Witmer's proposal as follows:

> My feeling is 5/3 needs to keep EMS whole both in the short term and the long term.  The fixed rates extended should be identical to the historical and not .8 to .9% higher.  Additionally, the excessive rates for this period need to be covered through eliminating the letter of credit and/or further reducing the fixed rates to cover the additional interest expense EMS will experience until the fixed rate loans are in place.  I believe this is only fair for a customer of EMS's stature.  I would like to see the rates adjusted accordingly and put in place immediately.  Please let me know as soon as possible!

Dkt. No. 228-9 at 2.  Later that same day, Bego told Witmer by email that he "want[ed] to move ahead on the term loans as long as we can get the rates adjusted.  I must be fair in that we are being courted heavily by other banks at this time!"  *Id.*

In mid-October, Bego wrote to Witmer and proposed that Fifth Third eliminate the 1% letter of credit fee on the VRDNs, and that any term loans should be at a rate of no more than 1%

---

[10]The Plaintiffs assert that the new proposed fixed rates were "more than approximately 2% higher than the effective fixed rates on the related swaps," but that fails to take into consideration the 1.3% fees the Plaintiffs were paying for the VRDN financing that they would not have paid under the new financing proposal.  The Plaintiffs also assert, without explanation, that "if the Plaintiffs [had chosen] to replace the VRDNs with traditional term loans at that point, the substantial fees it had incurred in connection with the VRDNs would have been wasted."  Dkt. No. 287 at 26.  It is not entirely clear what the Plaintiffs mean by this statement; however, it seems to the Court that those fees would not have been completely "wasted" if, in fact, they had allowed the Plaintiffs to pay less interest up until September 2008 than they would have paid had they used traditional financing instead of VRDNs, which is why the Plaintiffs agreed to pay them in the first place.  *See* Dkt. No. 231-1 at 59 (Bego explaining in his deposition that he chose to use VRDNs instead of traditional financing because the interest rates were lower).

above LIBOR.  Witmer responded by email that he doubted he could get credit committee approval of a loan at LIBOR plus 1%, but that the Bank would consider waiving the 1% letter of credit fee.  A few days later, Witmer informed Bego that he could not get approval of the reduced interest rate, but that there was a potential for lower rates as bond market conditions improved.  He also offered to have Fifth Third's senior lender meet personally with Bego to discuss matters.

For the next few months, Fifth Third and Bego continued to discuss, via email and in meetings, the terms under which the EMS Plaintiffs could convert their VRDNs to conventional loans, while at the same time Bego was pursuing options with other banks.  During that time period, the VRDN rates declined, decreasing the difference between them and LIBOR.  On November 28, 2008, Bego asked Witmer if he could leave the bond in place, noting that "it is taking so long for the fixed term that maybe if I wait I can make this up as the spread closes."  Dkt. No. 227-6 at 11.  Bego decided that he wanted to do so, and Witmer sent him the paperwork necessary to inform the VRDN trustee indicating that he had changed his mind about terminating the VRDNs.[11]

In early 2009, the parties negotiated an extension of the EMS Plaintiffs' Line of Credit, which was due to expire.  They executed a Seventh Amendment to Credit Agreement in January 2009, extending the Line of Credit's maturity date to May 31, 2009, and setting the interest rate at LIBOR plus 2.55%.

On April 1, 2009, Bego sent an email to Witmer, with a copy to Pelizzari, stating: "[Y]ou have to get something done to reduce our interest costs now or I am going to find another

---

[11]Earlier in November, Bego had informed the VRDN trustee that he wished to terminate the VRDNs and convert to conventional loans.

banking relationship."  Dkt. No. 228-19 at 2.  Witmer replied by noting that he was "working on
the bond transfer and renewal in May but [was] waiting on [the EMS Plaintiffs'] year-end
[financial] statements."  *Id.*  Shortly thereafter, Witmer sent Bego an email setting forth a
proposal for converting the EMS Plaintiffs' VRDNs to LIBOR-based loans that would work in
conjunction with the existing swaps to give the EMS Plaintiffs fixed interest rates.

       On April 14, 2009, Bego noted in an email to Witmer that Moody's had cut Fifth Third's
credit rating and commented that he hoped that would not affect the EMS Plaintiffs' rates.
Witmer responded that it should not do so, inasmuch as the bank's short-term and letter of credit
ratings were "affirmed."  Dkt. No. 292-18.

       On June 8, 2009, Witmer informed Bego that before the bank would approve a full year's
renewal of the EMS Plaintiffs' line of credit and conversion of the VRDNs to traditional loans, it
would require a "field exam" of the EMS Plaintiffs' businesses and reviewed fiscal year financial
statements versus compilations.  Witmer noted that the EMS Plaintiffs appeared to be in
violation of a financial covenant of their loan agreements and that he was working on getting a
waiver.  Finally, he noted that because of apparent deterioration in some of the factors used to
measure the EMS Plaintiffs' financial position, the interest rate on the EMS Plaintiffs' Line of
Credit was likely to increase, but that he was "working with senior management to potentially
work that down" in light of the "non-credit business" the EMS Plaintiffs had with the bank.  Dkt.
No. 227-6.  He then asked if Bego was available for a phone call with Witmer's boss, Tom Witt.
Bego responded the same day that he refused to talk or meet with Witt but would meet with
someone else, preferably "John" (presumably bank president Pelizzari), that he would not pay
more than 2% over LIBOR on the line of credit, and that a field exam was fine but that he would
not provide the financial statements the bank wanted unless the bank paid for them.   He

concluded by saying he had "already started the process" of moving the Plaintiffs' business to a new bank and would have no problem doing so.   In an email the following week, Bego requested "detailed covenant calculations," noted that Fifth Third was proposing an increase in interest rates on the EMS Plaintiffs' debt and therefore there was "no reason to continue refinancing or potentially doing business together," and opined that it appeared that Fifth Third was no longer interested in having the Plaintiffs as its customers.  Dkt. No. 229-1.  He added that the initial rate quotes he was receiving from Fifth Third's competitors were lower than those Fifth Third was offering.

Nonetheless, it appears that Witmer continued to look for a solution that would be acceptable to Bego, as a few days later Witmer emailed Bego, provided him with the covenant calculations he had requested, and noted that a recent downgrade of the bank's rating by S&P "could realistically cause the [VRDN] rates to increase."[12]  Dkt. No. 289-7.

In August 2009, Witmer attempted to schedule the field exam; Bego balked, stating that it was "premature" until Fifth Third agreed to the loan terms he was seeking and that he was not comfortable with the fact that it would not be performed by Fifth Third, but rather by an independent company.  When Witmer responded that the bank's offered terms were firm, Bego replied that he was "sorry to hear that" and that he would "continue the process of consummating a new banking relationship."  Dkt. No. 229-2.  The following week, on August 18, 2009, Bego wrote that he had chosen four other banks to meet with, and expected to be moving to one of

---

[12]In his affidavit filed in response to the instant motion for summary judgment, Bego characterizes this June 2009 email as the point at which he "learned . . . that the swaps were not functioning as Fifth Third had represented to 'lock in' fixed rates on [the Plaintiffs'] corporate debt."  Dkt. No. 289-1 at 6.  It is unclear, then, to what Bego was referring when he spoke of waiting to see if the spread closed in November 2008.  *See* Dkt. No. 227-6 at 11.

them "in the near future."  Dkt. No. 229-3.  Witmer responded that the EMS Plaintiffs had the

right to take their business elsewhere, but if the discussions with the other banks did not work

out, Fifth Third was still "open to moving forward."  *Id.*

Despite Bego's threats to move to a new bank, the parties ultimately reached an

agreement on a further extension of the EMS Plaintiffs' Line of Credit.  On December 9, 2009,

Bego wrote to Witmer that he had "almost changed banks," but that "what saved you is the

relationship and the fact that bond rates dropped and the spread is only about 1% with LIBOR."

Dkt. No. 231-2.

The parties executed a Ninth Amendment to Credit Agreement on February 28, 2010.

In addition to extending the maturity date of the Line of Credit to September 5, 2010, the

amendment provided that the interest rate would vary based on certain "coverage ratios" of the

EMS Plaintiffs' financial statements.  It also provided that Plaintiffs would provide

"reviewed"—and not merely "compiled"—financial statements  within 120 days following the

end of each fiscal year beginning with the year ending December 31, 2009.  "Reviewed"

statements receive a higher level of scrutiny from the accountants than a compilation.

In June 2010, Witmer left Fifth Third and Kevin Hipskind replaced him as Bego's

primary contact at the bank.  Hipskind met with Plaintiffs multiple times in person between then

and the winter of 2011.

On October 7, 2010, Bego wrote to Hipskind suggesting that Fifth Third should forgive

the balance on the EMS Plaintiffs' Line of Credit, terminate the interest rate swaps with no

termination fee, and convert the existing VRDNs to fixed rate loans that were "competitive,

especially for a customer of EMS's stature."  Bego concluded by stating that he would "hate to

see this business relationship fall apart."  Dkt. No. 228-2 at 2.  In an email dated October 13,

2010, Hipskind informed Bego that Fifth Third disagreed with his position and that it expected the EMS Plaintiffs to comply with their agreements.  He followed up with another email to Bego on October 28, 2010, noting that the EMS Plaintiffs' loans were almost 60 days overdue and suggesting that the parties needed to either come to a long-term agreement as to the EMS Plaintiffs' Line of Credit and term debt or negotiate an exit strategy.

Starting in June 2009, once Bego understood that the interest rate swaps were not working to provide the EMS Plaintiffs with an effective fixed interest rate on its debts as he had believed they would, Bego and others working for the Plaintiffs requested information from Fifth Third, including an accounting of the net interest payments pursuant to the swaps and VRDNs, in order to understand "the source and amounts of [the EMS Plaintiffs'] unexpected, increased interest charges." Dkt. No. 289-1 ¶ 30-31.  By late 2010, the EMS Plaintiffs believed they had still received only incomplete, inadequate information from Fifth Third, and they "dedicated hundreds of hours using Fifth Third's incomplete information to attempt to compile [their] own information and calculations." *Id.* at ¶ 32.

Hipskind and Bego had failed to arrive at a resolution by February 5, 2011, when the Tenth Amendment to the Credit Agreement between the EMS Plaintiffs and Fifth Third expired. On February 18, 2011, Hipskind informed Bego that in order to renew the EMS Plaintiffs' Line of Credit again Fifth Third would require reviewed—as opposed to compiled—financial statements, as well as a number of other items that the EMS Plaintiffs had refused to provide. Bego refused—even though the extension of the Credit Agreement that he had signed in February 2010 expressly required reviewed financial statements—and stated that he was no longer willing to deal with Hipskind and wanted to meet personally with Nancy Huber, who had replaced Pelizzari as Fifth Third's President.  Huber agreed to meet with Bego, but asked that

Hipskind be present.  Bego refused and demanded a meeting between only himself and Huber, which she did not agree to.

> On February 24, 2011, Huber sent the following email to Bego:
>
> Dave, in light of your recent remarks and based on irreconcilable differences between EMS and Fifth Third Bank you will no longer work with Kevin Hipskind or me as representatives of the Fifth Third Bank, Central Indiana. We have transferred your relationship to David Fisher of our Bancorp Special Assets Group who together with David Kleiman of Benesch/Dann Pecar, our outside counsel, are prepared to discuss with you and your counsel the terms of either a forbearance arrangement or a short extension to allow you to seek another bank.
>
> I have followed the discussions between you and Kevin over the last several months and support the bank's position that we have conducted business appropriately. After months of controversy, I believe it's in everyone's best interest to sever our banking relationship with EMS allowing you to find a more compatible banking partner.

Dkt. No. 231-8 at 2.  The Special Assets Group is the department within Fifth Third that deals with borrowers deemed to represent a greater credit risk.  At the time of Huber's email to Bego, Fifth Third had decided that the relationship between it and the Plaintiffs would be terminated— i.e., it would not be rehabilitated.

Fifth Third's outside counsel, John Abels, sent a letter dated March 29, 2011, to the Plaintiffs' in-house counsel, Erik Bigelow, in which he requested that Bego and legal counsel attend a meeting at his law firm's offices on April 4, 2011, so that they could provide Fifth Third with information regarding their efforts to find replacement financing and pay off their outstanding debt with Fifth Third.  The date and time of the meeting had not been discussed in advance with Bego, and the letter asked Bigelow to propose another date or time during the week of April 4th if Bego was not available at the date and time proposed in the letter.  Bego never confirmed that he would attend the proposed meeting and, in fact, did not appear for the meeting. By email on April 4, 2011, after the time of the proposed meeting had passed with no sign of

Bego, Abels informed Bigelow that Fifth Third had, without notice, taken $773,987.49 from EMS's deposit account to pay the balance of the overdue Line of Credit plus $8,200 in attorney fees. Fifth Third decided to exercise its right to take this action because the EMS Plaintiffs were being uncommunicative and uncooperative with regard to working with Fifth Third to end their relationship.

Over the next several months, the EMS Plaintiffs negotiated extensively with several other banks. On more than one occasion, Bego told Fifth Third that the Plaintiffs would close with their new bank by a certain date but then failed to do so. In the end, it took seven months for the Plaintiffs to close with a new bank. Over the course of those seven months, counsel for Fifth Third requested on several occasions that the EMS Plaintiffs comply with their loan agreements to cure their defaults by providing reviewed financial statements and other information. Although the EMS Plaintiffs did not provide the requested reviewed financial statements, Fifth Third gave the Plaintiffs repeated extensions of time to move their accounts and, in the end, even waived some of its fees in order to facilitate the Plaintiffs' transition to a new bank.[13] During the same time period, the Plaintiffs requested on several occasions that Fifth Third provide them with a detailed accounting of all of their loan payments (principle and interest) and all fees and costs assessed by Fifth Third.[14] Fifth Third provided some, but not all, of the requested information.

---

[13]In its Statement of Material Facts Not in Dispute, Fifth Third asserts that Bigelow, the Plaintiffs' in-house counsel, "admitted that Fifth Third acted in good faith to facilitate th[e] process" of transitioning the business relationship to PNC Bank. As the Plaintiffs point out, the evidence cited by Fifth Third for this fact—Bigelow's deposition testimony—does not support it, as Bigelow testified only that he did not recall whether Fifth Third did anything that indicated it was not acting in good faith. Dkt. No. 243-2 at 4.

[14]In their Statement of Material Facts in Dispute, the Plaintiffs assert that "any purported 'delays' [in the Plaintiffs transitioning to a new bank] were caused by Fifth Third's ongoing failure to provide information EMS had repeatedly requested, to allow EMS to 'settle' with Fifth

In October 2011, the Plaintiffs moved to PNC Bank, which had offered them a better interest rate than they had at Fifth Third.  Fifth Third demanded that the Plaintiffs pay $577,905 in Early Termination Fees to terminate its four remaining swaps.  In order to change banks, the Plaintiffs had to secure Fifth Third's release of the collateral on the corporate debt.  Otherwise, PNC Bank would not close on the transaction.  By email dated September 27, 2011, Fifth Third informed the Plaintiffs that it would not release the collateral unless the Plaintiffs paid the disputed Early Termination Fees.  Ultimately, the Plaintiffs were forced to pay the Early Termination Fees, in the amount of $577,905, under protest, in order to avoid losing their deal with PNC Bank.

Fifth Third had the contractual right to terminate the swaps based on the Plaintiffs' defaults under their loan agreements, which were cross-defaults under the ISDA Agreement.  However, Fifth Third would have consented to the Plaintiffs' assignment of their swaps and told Bigelow that it believed the swaps would "most likely be assigned to an assignee, and [the Plaintiffs] will continue to make contractual payments to the assignee."  Dkt. No. 227-3 at 16.  Instead of assigning the swaps, however, the Plaintiffs terminated them by sending written

---

Third and effectuate the transition."  Dkt. No. 287 at 30.  However, the evidence cited for that proposition does not support it.  The Plaintiffs cite first to paragraph 37 of Bego's affidavit, which states that "Fifth Third's ongoing failure to provide information EMS had repeatedly requested, to allow EMS to 'settle' with Fifth Third and effectuate the transition to a new bank, made EMS's transition to PNC Bank take longer than it otherwise would have."  However, the immediately preceding paragraph of Bego's affidavit states that the Plaintiffs did not identify PNC Bank as their new bank until October 2011, and the following paragraph states: "Specifically, in order to change banks, EMS had to secure Fifth Third's release of EMS's collateral. PNC Bank informed me that it would not close on the transaction until that occurred."  Dkt. No. 289-1 at 7.  Taken together, these paragraphs speak only to the time it took to complete the transition once PNC Bank was selected; they do not explain the time it took to select PNC Bank.  The other two pieces of evidence cited by the Plaintiffs are letters written by Bigelow (Plaintiffs' in-house counsel) to Fifth Third's counsel.  Any statements in those letters are hearsay and not admissible for the truth of the matters asserted therein.

instructions to Fifth Third on October 17, 2011, which were confirmed on a recorded phone line. The Plaintiffs did not pursue an assignment of their swaps to PNC Bank or any other assignee because they believed that Fifth Third had misled them into executing the swaps and that the swaps had cost them substantial damages in increased interest charges, lost personnel time, attorney fees, and bank transfer fees.  Bego believed that Fifth Third should, in good faith under the circumstances, agree to terminate the swaps without charging early termination fees, but Fifth Third was unwilling to do so.

When the Plaintiffs terminated their swaps, Fifth Third terminated the offsetting "mirror image" counter-swaps it had entered into.  In the end, Fifth Third lost a few hundred dollars as a result of the termination of the swaps.  All in all, however, Fifth Third ultimately viewed the financial outcome of the termination of its relationship with the Plaintiffs as a "great result" for the bank.

### III.  DISCUSSION

In their Amended Complaint [Dkt. No. 253], the Plaintiffs assert the following claims: breach of duty of good faith and fair dealing (Count I); breach of fiduciary duty (Count II); fraud by omission/fraudulent concealment (Count III); constructive fraud (Count IV); negligent misrepresentation (Count V); and quantum meruit/unjust enrichment (Count VI).  Fifth Third moves for summary judgment on each of the Plaintiffs' claims.  The Court will address the claims in the same order as the parties do.

### A.  Breach of Fiduciary Duty

The Plaintiffs allege that "Fifth Third owed EMS fiduciary duties and it breached them in numerous respects, including by 'failing to disclose the risks of entering into [the] interest rate swap agreement[s], terminating the swap agreement[s], demanding payment of early termination

fees, and refusing to release EMS's collateral until those fees were paid.'"  Dkt. No. 287 at 35

(quoting Entry on Fifth Third's Motion for Judgment on the Pleadings, Dkt. No. 74, at 12).[15]

Fifth Third argues that it is entitled to summary judgment on the Plaintiffs' claim for breach of

fiduciary duty because Fifth Third had no fiduciary duty toward the Plaintiffs.

> Under New York law,[16] the "usual relationship of bank and customer is that of
> debtor and creditor," *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731
> F.2d 112, 122 (2d Cir.1984); *see Bank Leumi Trust Co. v. Block 3102 Corp.,* [180
> A.D.2d 588, 589 (N.Y. App. Div. 1992)], "and does not create a fiduciary
> relationship between the bank and its borrower or its guarantors," *id.* Though in
> unusual circumstances, a fiduciary relationship may arise even between a bank
> and a customer if there is either "a confidence reposed which invests the person trusted
> with an advantage in treating with the person so confiding," *Fisher v. Bishop,* 108
> N.Y. 25, 28, 15 N.E. 331, 332 (1888), or an assumption of control and
> responsibility, *see, e.g.*, *Gordon v. Bialystoker Center & Bikur Cholim, Inc.,* 45
> N.Y.2d 692, 698, 412 N.Y.S.2d 593, 596, 385 N.E.2d 285, 287–88 (1978), the mere
> fact that a corporation has borrowed money from the same bank for several years
> is insufficient to transform the relationship into one in which the bank is a fiduciary,
> *see Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d at 122.

*Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993).   In other words, "when

parties deal at arms length in a commercial transaction, no relation of confidence or trust

sufficient to find the existence of a fiduciary relationship will arise absent extraordinary

circumstances."  *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) (citation

omitted).  The Plaintiffs argue that there is an issue of fact regarding whether the relationship

between the parties constituted the type of "extraordinary circumstances" necessary to create a

fiduciary duty because "from the inception of the parties' relationship, Fifth Third represented

itself as a trusted advisor, possessed superior knowledge (and resulting 'influence' over [the

---

[15]It is not entirely clear why the Plaintiffs quote the Court's summary of their allegations
in a ruling that was made in the early stages of this case, rather than simply articulating what
their claims are.

[16]The parties agree that New York law applies in this case.

Plaintiffs'] decision-making), and, in fact, provided advice to [the Plaintiffs] based on its professed superior knowledge and expertise."  Dkt. No. 287 at 38.

Viewing the facts in the light most favorable to the Plaintiffs, it is true that Fifth Third provided advice to the Plaintiffs.  That, alone, however, is not sufficient to create a fiduciary duty.  *EBC I, Inc. v. Goldman Sachs & Co.*, 91 A.D.3d 211, 216-17 (N.Y. App. Div. 2011)[17] ("Advice alone, however, is not enough to impose a fiduciary duty.") (citing *Citibank, N.A. v. Silverman,* 85 A.D.3d 463, 466 (N.Y. App. Div. 2011); *Flying J Fish Farm v. Peoples Bank of Greensboro,* 12 So.3d 1185, 1191 (Ala. 2008)).  Nor is the fact that Fifth Third had more expertise in the types of transactions at issue—something that is likely true in almost all banking transactions—and Bego chose to rely on that expertise.  *See EBC I,* 91 A.D.3d at 216 ("[A] fiduciary duty cannot be imposed unilaterally."); *RNK Capital LLC v. Natsource LLC*, 76 A.D.3d 840, 842 (N.Y. App. Div. 2010) ("Moreover, that defendants may have had superior knowledge of the particular type of investment products involved does not, without more, create a fiduciary relationship, especially given that plaintiffs themselves are highly sophisticated business entities.").

Indeed, this case is, in that respect, similar to *EBC I,* in which the plaintiff's evidence that a fiduciary duty had been created between eToys and Goldman Sachs consisted of the testimony of the CEO of eToys that eToys relied on Goldman Sachs to give it advice in the best interests of eToys because

> they're Goldman Sachs, for crying out loud, and they make a market and they take companies public.  They completely control the process.  They know how to do it. They get it done. They raise the money for us. They are the experts. They do this every day. We do this once in a life.

---

[17]The Court notes that the Court of Appeals of New York granted leave to appeal this decision, 19 N.Y.3d 810 (2012), but it does not appear that any decision was ever issued on that appeal.

*EBC I,* 91 A.D.3d at 216.  The court held that "[t]his evidence amounts to a mere expression of confidence in Goldman Sachs's expertise, wholly insufficient to create a relationship of higher trust than would arise from the underwriting agreement alone," and noted that "a fiduciary duty cannot be imposed unilaterally."  *Id.* (citations and internal quotation marks omitted).

Also instructive is *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293 (2d Cir. 2002),[18] in which the Second Circuit held that the relationship between the parties did not constitute the type of "special circumstances" necessary to expand the limited fiduciary duty that a broker owes its client.  In that case, there was

> ample evidence that [the plaintiff] transferred his account to Bear's Private Client
> Services Group in part to get (as Bear advertised) access to the firm's top financial
> analysts and experts. And he received it. The record also supports inferences that
> Bear encouraged [the plaintiff's] betting on the dollar, that he moved half his
> position to the OTC market on the strength of [Bear's] advice, that twice he decided
> against liquidating his position at least in part because of Bear's advice that the
> dollar was still undervalued, and that he followed [Bear's] advice against trying to
> liquidate on the afternoon of Friday, March 3, 1995.

*Id.* at 1307.  The court rejected the plaintiff's argument characterizing "Bear's frequent giving of advice as an 'undertaking' that supports a generalized duty of reasonable care to perform ongoing advisory duties not created by contract," noting that the plaintiff

> bargained for the expertise of the Private Client Services Group, but he
> simultaneously signed account agreements making clear that he was solely
> responsible for his own investments.  It was thus obviously contemplated that [the
> plaintiff] would receive a lot of advice from Bear's senior economists and gurus,
> and that this advice would not amount to Bear's entrustment with the management
> of the account. It follows that [the plaintiff] cannot reasonably have believed that
> once he sought and Bear gave advice, Bear had become "account handler."

---

[18]The Court notes that the Plaintiffs cite to *Lehman Bros. Commercial Corp. v. Minmetals International Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 151 (S.D.N.Y. 2000), which, in turn, relied on the district court's ruling in *de Kwiatkowski*.  However, the district court's view of New York law and its application to the facts of that case ultimately did not carry the day.

*Id.* at 1308.  The court further noted that

> The transformative "special circumstances" recognized in the cases are circumstances that render the client dependent—a client who has impaired faculties, or one who has a closer than arms-length relationship with the broker, or one who is so lacking in sophistication that de facto control of the account is deemed to rest in the broker. The law thus imposes additional extra-contractual duties on brokers who can take unfair advantage of their customers' incapacity or simplicity.

*Id.*  Thus, the court reversed the jury's verdict that rested on a finding that a fiduciary duty had arisen due to the "special circumstances" of the parties' relationship.

In this case, the Plaintiffs argue as follows:

> The designated evidence, viewed in the light most favorable to [the Plaintiffs], demonstrates that from the inception of the parties' relationship, Fifth Third represented itself as a trusted advisor, possessed superior knowledge (and resulting "influence" over [the Plaintiffs' decision-making), and, in fact, provided advice to [the Plaintiffs'] based on its professed superior knowledge and expertise. The evidence shows that [the Plaitniffs'] relied on Fifth Third's advice, repeatedly and to its detriment.

Dkt. No. 287 at 38.  As in *EBC I*, and *de Kwiatkowski*, these facts are not sufficient to support a finding that the "special circumstances" of the parties' relationship created a fiduciary duty.

This is especially true in light of the fact that, as set forth in detail above, the contracts governing the swap transactions contained disclaimers of any fiduciary relationship between the parties.  "Generally, where parties have entered into a contract, courts look to that agreement to discover the nexus of the parties' relationship and the particular contractual expression establishing the parties' interdependency.  If the parties do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19-20 (2005); *cf. Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 174 (2d Cir. 2011) ("Here, there is no factual issue as to whether WCM provided

advice, recommendations, or other services to VCG, for . . . VCG expressly acknowledged in the

Agreement that the Forge credit default swap was an 'arm's length' transaction and that neither

Wachovia Bank nor 'any of its affiliates' had provided VCG or any of VCG's affiliates with 'any

agency, brokerage, advisory or fiduciary services' with respect to the Forge swap Agreement or

any agreement relating to it."); *CIBC Bank & Tr. Co. v. Credit Lyonnais*, 270 A.D.2d 138, 139

(N.Y. App. Div. 2000) ("[N]or is there merit to plaintiff's breach of fiduciary duty claim, which

is flatly contradicted by the parties' contracts in which each represented to the other that 'it is a

sophisticated institutional investor' that 'has acted in the capacity of an arm's-length contractual

counterparty and not as [the other's] financial advisor or fiduciary.'").[19]

     The Court finds as matter of law that the facts of record, viewed in the light most

favorable to the Plaintiffs, do not support a finding that Fifth Third had a fiduciary duty to the

Plaintiffs.  Accordingly, Fifth Third is entitled to summary judgment on the Plaintiffs' claim for

breach of fiduciary duty.[20]

---

[19]The Plaintiffs cite *Caiola v. Citibank, N.A.*, 295 F.3d 312, 330 (2d Cir. 2002), for the proposition that "under New York law, **general** disclaimers of reliance on advice, recommendations, or fiduciary duties are not enforceable unless they 'track the substance of the alleged misrepresentation.'" Dkt. No. 287 at 42 (emphasis in original).  The rule as set forth in *Caiola* and the cases cited therein relates to under what circumstances a contractual disclaimer renders reliance on misrepresentations by one contracting party to another unreasonable such that a fraud claim based on the misrepresentations is not viable.  That rule in no way means that a general disclaimer of any fiduciary duty is not relevant to the question of whether the parties intended to create a fiduciary relationship.

[20]The Plaintiffs are simply incorrect when they argue that they have created a "disputed issue of material fact" by offering the opinions of their experts that Fifth Third had a "duty to act in a commercially reasonable manner and in accordance with industry standards … – a duty akin to that of an investment advisor operating under a fiduciary standard."  Dkt. No. 287 at 38-39 n.39.  "[I]t is a fundamental precept of tort law that '[t]he existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the courts.'" *Begley v. City of New York*, 111 A.D.3d 5, 37 (N.Y. App. Div. 2013).  Just as fundamental is the fact that "[a]s a general rule, accordingly, an expert may not offer legal opinions," *Jimenez v.*

## B.  Fraud by Omission and Constructive Fraud

The Plaintiffs allege "that Fifth Third committed fraud (by omission) and/or constructive fraud in March and April 2008, when it failed to disclose the information regarding increased risk described in the March 2008 Memo, before advising [the EMS Plaintiffs] to enter into [the] April 2008 swap."  Dkt. No. 287 at 46.  Specifically, the Plaintiffs allege that Fifth Third had a duty to disclose the "'dislocation' of LIBOR and VRDN rates (and resulting increased basis risk) . . . as described in the March 2008 Memo."  *Id.*

To prevail on either their fraud by omission or their constructive fraud claim, the Plaintiffs must demonstrate that Fifth Third had a duty to disclose the information at issue.  *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007) ("Where a defendant, as here, seeks to show fraud by omission, it must prove additionally that the plaintiff had a duty to disclose the concealed fact."); *Allen v. Westpoint-Pepperell, Inc.*, 11 F. Supp. 2d 277, 283-84 (S.D.N.Y. 1997) ("To establish a claim for constructive fraud, plaintiffs must show (1) a confidential or fiduciary relationship exists, or alternatively that one party has superior knowledge not available to the other . . . .").

> It is well established that, absent a fiduciary relationship between the parties, a duty to disclose arises only under the "special facts" doctrine where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair. . . .  As a threshold matter, the doctrine requires satisfaction of a two-prong test: that the material fact was information peculiarly within the knowledge of [the defendant], and that the information was not such that could have been discovered by [the plaintiff] through the exercise of ordinary intelligence.

---

*City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013), and an expert cannot create a "question of fact" regarding the legal question of whether a duty existed.

*Jana L. v. W. 129th St. Realty Corp.*, 22 A.D.3d 274, 277-78 (N.Y. App. Div. 2005) (internal

quotation marks and citations omitted).  In other words, "if plaintiff has the means of knowing,

by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the

representation, he must make use of those means, or he will not be heard to complain that he was

induced to enter into the transaction by misrepresentations."  *Martin Hilti Family Tr. v. Knoedler*

*Gallery, LLC*, 137 F. Supp. 3d 430, 483 (S.D.N.Y. 2015) (citations omitted); *see also Schumaker*

*v. Mather,* 133 N.Y. 590, 596 (1892) (same).

   In this case, there is no dispute that the facts that form the basis of the Plaintiffs' fraud

claims all were available to the Plaintiffs should they have chosen to pay attention to them.  Fifth

Third provided the Plaintiffs with weekly statements regarding the rates applicable to the

Plaintiffs' VRDNs; the LIBOR rates on which the swaps were based were publicly available and

were provided to the Plaintiffs by Fifth Third in monthly rate reset notices.  A comparison of the

two rates each week would have revealed to the Plaintiffs the "dislocation" described in the

March 2008 Memo.  It would also have revealed the "increased basis risk" which is defined in

the Memo as follows:  "basis risk on a swap contract wherein the client counterparty is paying a

fixed rate and receiving a floating rate index is the difference between the index rate they receive

versus the floating/variable rate on the underlying debt."[21]  Dkt. No. 253-1 at 3-4.  Although the

---

[21]Although it is not entirely clear, it appears that the Plaintiffs believe the "increased swap basis risk" in the subject line of the March 2008 Memo refers to an increased risk that the dislocation between the two interest rates will continue to diverge (or perhaps will diverge more) in the future.  It does not.  Rather, the Memo clearly defines the "basis risk" in a swap arrangement that involves two different variable rates as the difference between the two rates.  Thus, the term "increased swap basis risk" as used in the Memo refers to the fact that the difference between the two rates at the time the Memo was written had increased from where it had historically been—close to zero.  With regard to whether there was an increased risk that the dislocation of the rates would continue, the Memo suggests that the author and others believed that it was unlikely, noting that "the overriding belief is that the near term market conditions are 'abberational' [sic] and unlikely to be sustained over an intermediate term and therefore a

Plaintiffs assert in their brief that they "had no ability, through the exercise of reasonable due diligence, to research, discover and appropriately evaluate the information detailed in the March 2008 Memo," Dkt. No. 287 at 49, they do not explain why this is so when the relevant rates were available to them and simple subtraction would have revealed that the difference between them had increased as of the date of the March 2008 Memo.  Fifth Third simply did not have a duty to "disclose" information to the Plaintiffs that was available to them, including the fact that the convergence of the two rates that Fifth Third had previously (correctly) told the Plaintiffs had existed historically did not exist in March 2008.  *Cf. Kwiatkowski*, 306 F.3d at 1308 ("Thus if Bear had a duty to advise Kwiatkowski in early 1995 that the dollar might fall, it could not arise merely because Bear advised him in late 1994 that the dollar might rise.").

Viewing the facts of record in the light most favorable to the Plaintiffs, the Court finds that Fifth Third had no duty to disclose the facts contained in the March 2008 Memo to the Plaintiffs.  Accordingly, Fifth Third is entitled to summary judgment on the Plaintiffs' claims for fraud by omission and constructive fraud.

## C.  Negligent Misrepresentation

The Plaintiffs' negligent misrepresentation claim is not actually based on any alleged "misrepresentations," but rather is based on Fifth Third's failure to disclose certain information.  Thus, Fifth Third is correct that the claim fails for the same reason as the Plaintiffs' fraud claims fail, because the Plaintiffs have not demonstrated that Fifth Third had the requisite duty to disclose under New York law.

---

'reversion to the mean' of the historical relationship of VRDN rates to the predicate pricing indexes will be experienced."  Dkt. No. 253-1 at 4.

## D.  Quantum Meruit/Unjust Enrichment

In Count XI of their Amended Complaint, the Plaintiffs allege the following:

97.  Fifth Third's conduct in failing to disclose the material information described in Paragraph 71(2)-(4) & (8) or otherwise surrounding the execution of the April 2008 interest rate swap led to the payment by EMS of substantial amounts to Fifth Third – including but not limited to payments under the April 2008 swap and the Early Termination Fee associated with that swap.

98.  Fifth Third has been unjustly enriched as a result, at EMS's expense. It is against equity and good conscious [sic] to permit Fifth Third to retain the amounts EMS paid relating to the April 2008 interest rate swap under the circumstances described herein.

99.  In addition, for all of the reasons described herein, including Fifth Third's refusal to release EMS's collateral unless EMS paid the Early Termination Fees on all of its swaps with Fifth Third, Fifth Third has been unjustly enriched in the full amount of those Early Termination Fees, at EMS's expense, and it is against equity and good conscience to permit Fifth Third to retain those Fees.

Dkt. No. 253 at 25.  It is undisputed that all of the payments made to Fifth Third by the Plaintiffs—including the early termination fees—were made pursuant to the contracts between the parties.  As Fifth Third correctly points out, "[a]s a general rule, the existence of a valid and enforceable written contract governing a particular subject matter precludes recovery in quasi-contract on theories of quantum meruit and unjust enrichment for events arising out of the same subject matter."  *Marc Contracting, Inc. v. 39 Winfield Assocs., LLC*, 63 A.D.3d 693, 695 (N.Y. App. Div. 2009).

A "quasi contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment. Indeed, we have stated that: "Quasi contracts are not contracts at all, although they give rise to obligations more akin to those stemming from contract than from tort.  The contract is a mere fiction, a form imposed in order to adapt the case to a given remedy.  Briefly stated, a quasi-contractual obligation is one imposed by law *where there has been no agreement or expression of assent, by word or act, on the part of either party involved.* The law creates it, regardless of the intention of the parties, to assure a just and equitable result.

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89 (1987) (emphasis in

original) (internal citations and quotation marks omitted).  Accordingly, "[i]t is impermissible . .

. to seek damages in an action sounding in quasi contract where the suing party has fully

performed on a valid written agreement, the existence of which is undisputed, and the scope of

which clearly covers the dispute between the parties."  *Id.* at 389.

> The Plaintiffs argue that their
>
> *quantum meruit*/unjust enrichment claims are not governed by the parties' swap
> or other contracts. None of those contracts "clearly cover" EMS's allegation, for
> example, that Fifth Third's fraud (by omission), constructive fraud and/or
> negligent misrepresentation relating to its failure to disclose the March 2008
> Memo induced EMS's to enter the April 2008 swap, leading to Fifth Third's
> recovery of hundreds of thousands of dollars in increased interest charges and
> Early Termination Fees.

Dkt. No. 287 at 57.  The Plaintiffs misunderstand the nature of quasi-contract claims.  A quasi-

contract is a contract implied in law to prevent an unjust result because no enforceable contract

exists; it is not a mechanism by which the terms of an existing contract can be modified or

avoided because enforcement of the contract would be "unjust."

> The basis of a claim for unjust enrichment is that the defendant has obtained a
> benefit which in "equity and good conscience" should be paid to the plaintiff.  In a
> broad sense, this may be true in many cases, but unjust enrichment is not a catchall
> cause of action to be used when others fail.  It is available only in unusual situations
> when, though the defendant has not breached a contract nor committed a recognized
> tort, circumstances create an equitable obligation running from the defendant to the
> plaintiff. Typical cases are those in which the defendant, though guilty of no
> wrongdoing, has received money to which he or she is not entitled.  An unjust
> enrichment claim is not available where it simply duplicates, or replaces, a
> conventional contract or tort claim.

*Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790-91 (2012) (citations omitted).  As in *Corsello*,

the Plaintiffs "allege that [the defendant] committed actionable wrongs . . . . To the extent that

these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are

defective, an unjust enrichment claim cannot remedy the defects."  *Id.* at 791.

There can be no dispute that the payments the Plaintiffs made to Fifth Third were made pursuant to the parties' contractual agreements.  The contracts fully covered the Plaintiffs' obligations to make payments to Fifth Third, and the Plaintiffs did, in fact, make those payments. The Plaintiffs may not now recover those payments under a quasi-contract theory.  Accordingly, Fifth Third is entitled to summary judgment on the Plaintiffs' quantum meruit/unjust enrichment claim.

### F.  Breach of Duty of Good Faith and Fair Dealing

With regard to the Plaintiffs' claim for breach of the duty of good faith and fair dealing, as an initial matter, the Plaintiffs note several times that the Court declined to grant Fifth Third's motion for judgment on the pleadings on this claim, implying that that ruling should dictate the outcome of this one.  A ruling declining to dismiss a claim at the pleadings stage is simply a determination that the allegations in the complaint satisfy the very liberal notice pleading standard—that the plaintiff has demonstrated "more than a sheer possibility that a defendant has acted unlawfully."  *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir.), *reh'g denied,* 807 F.3d 839 (7th Cir. 2015), and *cert. denied,* 136 S. Ct. 1607 (2016) (citations omitted).   In this case, that was a determination that the facts surrounding the parties' relationship as described by the Plaintiffs left room for "more than a sheer possibility" that Fifth Third took actions during the course of that relationship that violated the duty of good faith and fair dealing.  At the summary judgment stage, the question is altogether different; the Court must now determine whether the Plaintiffs have pointed to evidence that would support a judgment in their favor.

Along that same vein, the Court notes that the Plaintiffs are a bit cagey with regard to what actions Fifth Third took that they believe support their claim for breach of the duty of good

faith and fair dealing, several times qualifying their discussion with "without limitation."  *See,*

*e.g.*, Dkt. No. 287 at 69 ("Fifth Third breached its duty to disclose numerous times and

continuously over the course of its relationship with EMS, including, without limitation . . .").

Summary judgment is the time for the Plaintiffs to inform the Court what their allegations are

and what evidence they have to support those allegations.  Qualifiers such as "without

limitation" are therefore meaningless in the summary judgment context; if the acts clearly

identified by the Plaintiffs are not sufficient to allow the Plaintiffs to survive summary judgment,

the fact that there might be additional acts lurking in the shadows is irrelevant.  In addition, the

Plaintiffs state in a footnote:

> EMS contends that Fifth Third breached its fiduciary duty and its implied duty of good faith and fair dealing in ways that are not specifically addressed in Fifth Third's Brief – *e.g.*, without limitation, by failing to disclose to EMS the March 2008 internal email memorandum, before advising and allowing EMS to execute its April 2008 swap, and by withdrawing $773,987.49 from EMS's deposit account, without notice, simply because Mr. Bego did not attend a unilaterally scheduled meeting that he never confirmed. Fifth Third's Motion for Summary Judgment should be denied on these allegations as well.

Dkt. No. 287 at 60 n.59.  "[I]t is not this court's responsibility to research and construct the

parties' arguments," *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011), and simply

mentioning these additional acts, without providing any analysis regarding how they support a

claim for the breach of the implied duty of good faith and fair dealing, is not sufficient to raise

the issue.  The Court addresses below those arguments that the Plaintiffs properly support with

regard to their claim for breach of the duty of good faith and fair dealing.

Under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair

dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289,

291 (N.Y. 1995).

> The implied covenant of good faith and fair dealing prevents any party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) (quotation marks omitted). The doctrine is employed when necessary to "effectuate the intentions of the parties, or to protect their reasonable expectations." *M/A–COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) (quotation marks omitted). In order to find a breach of the implied covenant, a party's action must "directly violate an obligation that may be presumed to have been intended by the parties." *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 407–08 (2d Cir. 2006) (quotation marks omitted). The covenant cannot be used, however, to imply an obligation inconsistent with other terms of a contractual relationship. *Dalton,* 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289.

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013).

The Plaintiffs allege that Fifth Third breached the covenant by terminating the parties' relationship, including the VRDNs and the swaps,[22] and withholding the Plaintiffs' collateral to force the Plaintiffs to pay the early termination fees. Fifth Third argues that these actions cannot support a claim for breach of the duty of good faith and fair dealing because, as the Plaintiffs concede, in taking these actions Fifth Third was exercising its rights under the contract. The Plaintiffs argue to the contrary, pointing out, correctly, that a party does not have to breach the express terms of the contract in order to breach the implied covenant of good faith and fair dealing. Indeed, as the Plaintiffs point out, if the actions complained about by a plaintiff constitute a breach of the contract, then any claim for breach of the implied covenant based on the same actions should be dismissed as duplicative. Dkt. No. 287 at 59-60 n.52 (citing *In re InSITE Servs. Corp., LLC*, 287 B.R. 79, 93 (Bankr. S.D.N.Y. 2002)).

The Plaintiffs argue that Fifth Third's insistence on exercising its rights under the contract was unfair to the Plaintiffs, given "the unique totality of the circumstances in this case."

---

[22]The Court assumes, without deciding, that the Plaintiffs have demonstrated the existence of an issue of fact with regard to whether they or Fifth Third terminated the swaps.

Dkt. No. 287 at 50.[23]  However, the duty of good faith and fair dealing is not a general fairness

requirement that permits a party to avoid its obligations under a contract simply because events

have made the contract not as attractive or "fair" as the party thought they would be.  Rather, as

the Plaintiffs correctly note in another context, "[u]nder New York substantive law, a claim for

breach of duty of good faith and fair dealing sounds in contract, not tort."  Dkt. No. 287 at 33.

As such, the effect of the implied covenant is to read into the contract an "obligation that may be

presumed to have been intended by the parties" at the time they entered into their contractual

agreements and provide a remedy if that implied term is "directly violated."  *See Gaia House*,

720 F.3d at 93.  The Plaintiffs have not identified any such term in this case.  Instead, they have

identified terms of the contracts—rights given to Fifth Third under the contracts—that they

apparently believe could not have been enforced by Fifth Third in good faith under the

circumstances.  However, "the implied covenant of good faith cannot create duties that negate

explicit rights under a contract," *LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184,

195-96 (2d Cir. 2013) (citing *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 304 (1983)),

and the "implied covenant does not require a party to act against his own self interest even

though the other party's interest may be incidentally adversely affected by the party's action."

*State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 246 F. Supp. 2d 231, 241 (S.D.N.Y.

2002), *aff'd*, 374 F.3d 158 (2d Cir. 2004) (citations omitted); *see also Fasolino Foods Co. v.*

---

[23]The Plaintiffs assert that Fifth Third's decision to terminate the parties' relationship "constituted a breach of its duty of good faith and fair dealing, because, without limitation, termination at that particular time resulted in [the Plaintiffs], under the technical terms of the contracts, allegedly owing [early termination fees]."  Dkt. No. 287 at 64.  However, the Plaintiffs do not explain what facts of record they believe demonstrate that Fifth Third's decision to terminate the relationship when they did—after many months of attempts to negotiate a solution had failed—was in bad faith or suggest what they believe Fifth Third should have done instead, other than to waive the termination fees, which they raise as a separate breach.

*Banca Nazionale del Lavoro,* 961 F.2d 1052, 1057 (2d Cir. 1992) ("Even after you have signed a contract, you are not obliged to become an altruist toward the other party and relax the terms if he gets into trouble in performing his side of the bargain.") (*quoted in Gaia House*, 720 F.3d at 94). The implied covenant of good faith and fair dealing simply did not require Fifth Third to forgo its explicit rights under the contract, no matter how "unfair" the Plaintiffs feel it was for it to refuse to do so.[24]

The Plaintiffs also argue that Fifth Third violated its duty of good faith and fair dealing by failing to disclose certain material information, specifically: "(1) the nature and magnitude of risks associated with the VRDNs; (2) the existence, nature or magnitude of the 'basis risk' inherent in using LIBOR-based swaps to hedge variable rate risk on VRDNs; (3) its counter-swap relationships with Mellon Bank and Wells Fargo; (4) the March 2008 email memorandum recognizing increased basis risk on LIBOR-based swaps used to hedge VRDN rate risk; and/or (5) the reasons for the VRDN rate increases or for the break-down in the VRDN rate-LIBOR correlation, in the Fall of 2008 and through termination of the parties' banking relationship in late-2011." Dkt. No. 287 at 64. There are several problems with this argument. First, under

---

[24]The Plaintiffs argue that "[a]s Judge Posner explained . . ., good faith requires that a party to a contract not take 'opportunistic advantage' of an unforeseeable situation 'in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties," and "[t]his is precisely what Fifth Third did in this case." Dkt. No. 287 at 63 (quoting *Market St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 594-96 (7th Cir. 1991)). The quoted language must be considered in context, however. As Judge Posner has also explained "'problems involving the obligation of good faith and fair dealing generally arise where one party to a contract is given broad discretion in performance. The covenant of good faith requires that a party vested with contractual discretion exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties. Parties to a contract, however, are entitled to enforce the terms of the contract to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract.'" *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 462 (7th Cir. 2014) (quoting *Northern Tr. Co. v. VIII South Mich. Assocs.,* 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995)).

New York law, "[i]n the absence of a special relationship between two parties to a contract, no duty to disclose exists," *George Cohen Agency, Inc. v. Donald S. Perlman Agency, Inc.*, 114 A.D.2d 930, 931 (N.Y. App. Div. 1985) (citations omitted), and the implied covenant of good faith and fair dealing does not create the requisite "special relationship." *Manti's Transp., Inc. v. C.T. Lines, Inc.*, 68 A.D.3d 937, 940 (N.Y. App. Div. 2009). Therefore, regardless of whether a special relationship was formed such that the duty to disclose arose, Fifth Third could not have breached its *duty of good faith and fair dealing* by failing to disclose information.[25] Further, "[t]he implied covenant of good faith and fair dealing applies to the performance and execution of an existing contract." *State St. Bank & Tr. Co.*, 246 F. Supp. 2d at 241-42. The Plaintiffs do not explain how the disclosure of the information at issue was relevant to either side's *performance and execution* of the various contracts between the parties, as opposed to the Plaintiffs' decision whether to enter into the contracts in the first place. Accordingly, they do not explain how the breach of any duty to disclose information that might have existed constituted a breach of the duty of good faith and fair dealing by Fifth Third.

Finally, the Plaintiffs argue that Fifth Third breached the duty of good faith and fair dealing by "failing to provide a full, complete, and accurate accounting and to provide its methodology for its ongoing charges, as well as its failure to meet face-to-face with [the Plaintiffs], notwithstanding [the Plaintiffs'] repeated requests for information." Dkt. No. 287 at 68. The Plaintiffs do not specifically identify what information Fifth Third failed to provide or explain why the information that Fifth Third did provide was not sufficient to allow the Plaintiffs

---

[25]The case cited by the Plaintiffs, *Proctor & Gamble Co. v. Bankers Tr. Co.*, 925 F. Supp. 1270 (S.D. Ohio 1996) (applying New York law), does not hold otherwise; rather, the court in that case examined whether a duty to disclose arose in the context of the plaintiff's fraud claim, as did the court in the Second Circuit case cited therein.

to make the unspecified decisions to which they refer; nor do the Plaintiffs explain when Fifth Third refused to meet face-to-face and why they had a duty to agree to the meeting in question. Indeed, as Fifth Third points out, the Plaintiffs point to no evidence at all regarding this claim, but simply cite to the allegations in their Amended Complaint.  While this type of general allegation was sufficient to survive a motion to dismiss, it is not sufficient to survive summary judgment.

The Plaintiffs have not demonstrated that a reasonable factfinder, viewing the facts of record in the light most favorable to them, could find that Fifth Third breached its duty of good faith and fair dealing during the course of the parties' relationship.  Accordingly, Fifth Third is entitled to summary judgment on that claim as well.

## IV.  CONCLUSION

For the reasons set forth above, Fifth Third's motion for summary judgment is **GRANTED** as to each of the Plaintiffs' claims.  Judgment will be entered accordingly.

SO ORDERED: 7/12/16

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification